Citation Nr: 1319528 
Decision Date: 06/18/13 Archive Date: 06/27/13

DOCKET NO. 07-33 440 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Denver, Colorado


THE ISSUES

1. Entitlement to an effective date prior to November 17, 2004, for an award of service connection for a chronic orthopedic disability of the right and left knee.

2. Entitlement to an initial evaluation greater than 10 percent for chondromalacia patella of the right knee, status post arthroscopy with residual degenerative joint disease (DJD) prior to August 20, 2012.

3. Entitlement to an initial evaluation greater than 10 percent for chondromalacia patella of the left knee, status post arthroscopy with residual DJD prior to July 5, 2010.

4. Entitlement to an initial evaluation greater than 10 percent for left knee laxity prior to July 5, 2010.

5. Entitlement to an evaluation above 30 percent for left knee, status post total knee arthroplasty from September 1, 2011.


REPRESENTATION

Appellant represented by: Disabled American Veterans


WITNESS AT HEARING ON APPEAL

The Veteran


ATTORNEY FOR THE BOARD

Bernard T. DoMinh, Counsel


INTRODUCTION

The Veteran served on active duty from October 1987 to November 1991.

This matter comes to the Board of Veterans' Appeals (Board) on appeal from a January 2007 rating decision by the Denver, Colorado, Regional Office (RO) of the Department of Veterans Affairs (VA), which granted the Veteran service connection for right and left knee chondromalacia patella, status post arthroscopy with residual DJD, assigning an initial 10 percent evaluation to each knee, effective November 17, 2004. The Veteran appeals the initial ratings and the effective date of the service connection award assigned to each knee.

During the course of the appeal, a January 2008 rating decision assigned a separate 10 percent evaluation for laxity of the left knee, effective April 24, 2008. 

In July 2010, the current appeal was certified to the Board. 

On July 5, 2010, the Veteran underwent a total knee arthroplasty of his left knee. By rating decision of December 2010, the separate 10 percent evaluation for laxity of the left knee was discontinued, effective July 5, 2010. Therefore, the issue before the Board is entitlement to an initial evaluation greater than 10 percent for laxity of the left knee from April 24, 2008 to July 4, 2010. The December 2010 rating decision also assigned a 100 percent rating for postoperative convalescence under 38 C.F.R. § 4.30 to the left knee, effective July 5, 2010 to August 31, 2010, after which a 100 percent schedular rating for left knee replacement with prosthesis was assigned, effective September 1, 2010 to August 31, 2011. Thereafter, a 30 percent rating went into effect on September 1, 2011. Therefore, as the maximum rating has been assigned for the left knee for the period from July 5, 2010 to August 31, 2011, the issues before the Board are the propriety of the 10 percent rating assigned for the left knee from November 17, 2004 to July 4, 2010, and the 30 percent rating assigned for the left knee (status post total knee arthroplasty) as of September 1, 2011.

On August 20, 2012, the Veteran underwent a total knee arthroplasty of his right knee. By rating decision of April 2013, a 100 percent schedular rating for right knee replacement with prosthesis was assigned, effective August 20, 2012 to September 30, 2013, with a proposal to reduce the rating to 30 percent rating effective on October 1, 2013. 

In April 2013, the Veteran, accompanied by his representative, appeared at the RO to present oral testimony in support of his appeal before the undersigned Veterans Law Judge. A transcript of this hearing has been obtained and associated with the Veteran's claims file for the Board's review and consideration.

For the reasons that will be discussed in the REMAND portion of this decision, the issues of entitlement to an initial evaluation greater than 10 percent for chondromalacia patella of the left knee, status post arthroscopy with residual DJD prior to July 5, 2010; entitlement to an initial evaluation greater than 10 percent for left knee laxity prior to July 5, 2010; and entitlement to an evaluation above 30 percent for left knee, status post total knee arthroplasty from September 1, 2011 are REMANDED to the RO via the Appeals Management Center (AMC), in Washington, D.C., for further evidentiary development. The Veteran and his representative will be notified if any further action is required on their part. 


FINDINGS OF FACT

1. In April 2013, prior to the promulgation of a decision in the appeal, the Board received notification from the appellant requesting a withdrawal of his appeal with regard to the claim for an effective date prior to November 17, 2004, for an award of service connection for a chronic orthopedic disability of the right and left knee.

2. Prior to June 4, 2010, chondromalacia patella of the right knee, status post arthroscopy with residual DJD, was manifested by subjective complaints of right knee pain, with pain on use and with prolonged standing, sitting, and physical activity, and sensations of right knee instability, with X-ray evidence of postoperative and degenerative changes of the right knee and range of motion tests demonstrating extension to no more than 5 degrees and flexion to no less than 90 degrees, but with no objective demonstration of additional limitation of motion due to pain following repetitive motion and no objective demonstration of right knee instability.

3. As of June 4, 2010, chondromalacia patella of the right knee, status post arthroscopy with residual DJD, was manifested by MRI evidence of semilunar cartilage dislocation, with subjective complaints of right knee pain, with pain on use and with prolonged standing, sitting, and physical activity, and sensations of right knee instability, with X-ray evidence of postoperative and degenerative changes of the right knee and range of motion tests demonstrating extension to no more than 5 degrees and flexion to no less than 90 degrees, but with no objective demonstration of additional limitation of motion due to pain following repetitive motion and no objective demonstration of right knee instability.






CONCLUSIONS OF LAW

1. The criteria for withdrawal of an appeal for an earlier effective date prior to November 17, 2004, for an award of service connection for a bilateral knee disability have been met. 38 U.S.C.A. § 7105(b)(2), (d)(5) (West 2002); 38 C.F.R. § 20.204 (2012).

2. The criteria for initial evaluation greater than 10 percent for chondromalacia patella of the right knee, status post arthroscopy with residual DJD, prior to June 4, 2010 have not been met. 38 U.S.C.A. § 1155 (West 2002 & Supp. 2012); 38 C.F.R. § 4.71a, Diagnostic Codes 5003-5010, 5257, 5258, 5259, 5260, 5261 (2012). 

3. The criteria for a 20 percent evaluation (and no higher) for chondromalacia patella of the right knee, status post arthroscopy with residual DJD, for the period from June 4, 2010 to August 19, 2012 have been met. 38 U.S.C.A. §§ 1155, 5107(b) (West 2002 & Supp. 2012); 38 C.F.R. §§ 4.2, 4.7, 4.71a, Diagnostic Code 5258 (2012).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

(a.) Entitlement to an effective date prior to November 17, 2004, for an award of service connection for a chronic orthopedic disability of the right and left knee.

The Board may dismiss any appeal which fails to allege specific error of fact or law in the determination being appealed. 38 U.S.C.A. § 7105. An appeal may be withdrawn as to any or all issues involved in the appeal at any time before the Board promulgates a decision. 38 C.F.R. § 20.204. Withdrawal may be made by the appellant or by his or her authorized representative. 38 C.F.R. § 20.204. 

In the present case, after the appeal was certified to the Board in July 2010, but prior to promulgation of an appellate decision, the appellant, in written and signed correspondence dated in April 2013, and in oral statements made in the presence of his representative and submitted directly to the undersigned Veterans Law Judge at his April 2013 hearing, expressly withdrew his appeal with regard to the issue of entitlement to an effective date prior to November 17, 2004, for an award of service connection for a chronic orthopedic disability of his right and left knee. Thus, as there remain no allegations of errors of fact or law with respect to this issue for appellate consideration, the Board does not have jurisdiction to review the appeal for an earlier effective date for an award of service connection for a bilateral knee disability. The matter is dismissed.

(b.) Entitlement to an initial evaluation greater than 10 percent for chondromalacia patella of the right knee, status post arthroscopy with residual DJD prior to August 20, 2012.

In accordance with the Veterans Claims Assistance Act of 2000 (VCAA), VA has an obligation to notify claimants what information or evidence is needed in order to substantiate a claim, as well as a duty to assist claimants by making reasonable efforts to get the evidence needed. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A and 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2012); see also Quartuccio v. Principi, 16 Vet. App. 183, 187 (2002).

Generally, the notice requirements of a claim have five elements: veteran status, existence of a disability, a connection between the veteran's service and the disability, degree of disability, and effective date of the disability. Dingess v. Nicholson, 19 Vet. App. 473 (2006). VCAA notice must also: (1) inform the claimant about the information and evidence necessary to substantiate the claim; (2) inform the claimant about the information and evidence that VA will seek to provide; (3) inform the claimant about the information and evidence the claimant is expected to provide; and (4) request that the claimant provide any evidence in his possession that pertains to the claim. See 38 U.S.C. § 5103(a); 38 C.F.R. § 3.159(b); Beverly v. Nicholson, 19 Vet. App. 394, 403 (2005) (outlining VCAA notice requirements). During the course of the appeal, § 3.159(b) was revised and the requirement that VA request that the claimant provide any evidence in his possession that pertains to the claim was removed from the regulation.

The appeal pertains to the initial evaluation assigned for an original grant of service connection, effective from November 17, 2004, which is a downstream issue from a rating decision dated in January 2007, which initially established service connection for the right knee disability at issue and assigned the initial evaluation being contested and its effective date. The United States Court of Appeals for Veterans Claims (Court) held in Dingess/Hartman v. Nicholson, 19 Vet. App. 473, 490-91 (2006), that in cases where service connection has been granted and an initial disability rating and effective date have been assigned, the typical service connection claim has been more than substantiated, it has been proven, thereby rendering section 5103(a) notice no longer required because the purpose that the notice is intended to serve has been fulfilled. See also Dunlap v. Nicholson, 21 Vet. App. 112 (2007); Goodwin v. Peake, 22 Vet. App. 128 (2008). Thusly, to the extent that there is any defect in, or non-compliance with the statutorily prescribed VCAA notice requirements with respect to the issue adjudicated on the merits herein, these deficits are deemed to be non-prejudicial to this claim.

VA also has a duty to assist the Veteran in obtaining evidence necessary to substantiate the claim. 38 U.S.C.A. § 5103A(a) ("The Secretary shall make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate the . . . claim"). This duty includes assisting the Veteran in obtaining records and providing medical examinations or obtaining medical opinions when such are necessary to make a decision on the claim. 38 U.S.C.A. § 5103A(b), (c), (d) (setting forth Secretary's various duties to claimant).

With respect only to the right knee claim decided on the merits in this decision, VA informed the Veteran of its duty to assist in obtaining records and supportive evidence. The Board observes that the temporal focus of this claim is the period from November 17, 2004 to August 19, 2012, and that the Veteran's service department and private, VA, and Social Security Administration (SSA) medical and examination records pertinent to treatment of the right knee disability at issue for the period from November 2004 to August 2012 have been obtained and associated with his claims file or are otherwise accessible and viewable on the Virtual VA electronic database. Furthermore, the Veteran was provided with VA examinations in July 2005, October 2006, April 2008, December 2009, and September 2011 to assess the severity of the right knee disability decided herein. These examinations and their findings are predicated on review of the Veteran's pertinent clinical history and are thus adequate for VA adjudication and compensation purposes. See Barr v. Nicholson, 21 Vet. App. 303, 311-12 (2007); Stefl v. Nicholson, 21 Vet. App. 120, 124 (2007). 

In Bryant v. Shinseki, 23 Vet. App. 488 (2010), the Court held that 38 C.F.R. § 3.103(c)(2) (2012) requires that the Decision Review Officer or Veterans Law Judge who chairs a hearing fulfill two duties to comply with the above the regulation. These duties consist of (1) the duty to fully explain the issues and (2) the duty to suggest the submission of evidence that may have been overlooked. See Bryant v. Shinseki, 23 Vet. App. 488 (2010). 

During the April 2013 Board hearing, the undersigned Veterans Law Judge's questions and the Veteran's oral testimony focused on the elements necessary to substantiate, inter alia, the Veteran's claim for a higher initial evaluation for his service-connected right knee disability. The Veterans Law Judge, furthermore, has clarified the issue on appeal, focusing on the propriety of the rating assigned for the right knee up to August 19, 2012, acknowledging that the August 20, 2012 total right knee arthroplasty would result in the RO's assignment of the maximum 100 percent rating, effective on that date. [See page 2 of transcript of April 30, 2013 Board hearing.] Thus, the Board finds that the Veterans Law Judge presiding over the September 2012 hearing has substantially fulfilled his obligations as required under 38 C.F.R. § 3.103(c)(2). Bryant, supra.

The Board is ultimately satisfied that the evidence is sufficiently developed for appellate adjudication and that no further development is necessary with respect only to the issues decided on the merits herein. The Board notes that the Veteran is represented in the current appeal and has had opportunity to submit additional evidence in support of the right knee claim. He has not indicated that there are any outstanding relevant medical or service records or other pertinent evidence that must be considered in this current appeal with respect to the issues decided herein. Furthermore, the Board has searched the Veteran's claim on the Virtual VA electronic database for any other additional medical records pertinent to his claim.

Based on the foregoing, the Board finds that the VA fulfilled its VCAA duties to notify and to assist the Veteran in the evidentiary development of the right knee claim decided herein, and thus no additional assistance or notification is required in this regard. The Veteran has suffered no prejudice that would warrant a remand, and his procedural rights have not been abridged. See Bernard v. Brown, 4 Vet. App. 384 (1993). The Board will therefore proceed with the adjudication of this appeal.

Disability ratings are determined by applying the criteria set forth in the VA's Schedule for Rating Disabilities, which is based on the average impairment of earning capacity. Individual disabilities are assigned separate diagnostic codes. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1 (2012). The basis of disability evaluations is the ability of the body as a whole, or of the psyche, or of a system or organ of the body to function under the ordinary conditions of daily life including employment. 38 C.F.R. § 4.10 (2012). 

In determining the severity of a disability, the Board is required to consider the potential application of various other provisions of the regulations governing VA benefits, whether or not they were raised by the Veteran, as well as the entire history of the Veteran's disability. 38 C.F.R. §§ 4.1, 4.2 (2012); Schafrath v. Derwinski, 1 Vet. App. 589, 595 (1991).

If the disability more closely approximates the criteria for the higher of two ratings, the higher rating will be assigned; otherwise, the lower rating is assigned. 38 C.F.R. § 4.7 (2012). It is not expected that all cases will show all the findings specified; however, findings sufficiently characteristic to identify the disease and the disability therefrom and coordination of rating with impairment of function will be expected in all instances. 38 C.F.R. § 4.21 (2012). 

When rating a musculoskeletal disability such as the knee disorder at issue, functional loss due to pain must be considered. A thorough evaluation of a musculoskeletal or orthopedic disability for rating purposes requires consideration of any functional loss due to pain, incoordination, weakness, or fatigability. 38 C.F.R. §§ 4.40, 4.45 (2012); DeLuca v. Brown, 8 Vet. App. 202 (1995). 

In deciding this appeal, the Board has considered whether separate ratings for different periods of time, based on the facts found, are warranted, a practice of assigning ratings referred to as "staging the ratings." See Fenderson v. West, 12 Vet. App. 119 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2008). The relevant temporal focus commences on November 17, 2004, based on the date of VA's receipt of the Veteran's claim for VA compensation for a right knee disability (see 38 C.F.R. § 3.400 (2012)), and ends on August 19, 2012, as the maximum 100 percent evaluation took effect the following day, when he underwent surgery for a total right knee arthroplasty. 

The Board notes at this juncture that by rating decision of April 2013, a 100 percent schedular rating under 38 C.F.R. § 4.71a, Diagnostic Code 5055, for the Veteran's right knee replacement with prosthesis was assigned, effective August 20, 2012 to September 30, 2013. The April 2013 rating decision contemplated a future reduction of the total rating to 30 percent, and assigned a provisional effective date of October 1, 2013, for this 30 percent rating. Therefore, as the maximum rating has been effectively assigned for the right knee as of August 20, 2012, and continues to remain in effect at the time that this appellate decision is being rendered, the issue before the Board is the propriety of the 10 percent rating assigned for the right knee from November 17, 2004 to August 19, 2012. The RO will likely issue a definitive rating decision in the future, in or around October 2013, which will address the appropriate evaluation to assign to the Veteran's right knee, at which time the Veteran is respectfully advised that he may appeal the rating decision implementing any evaluation less than 100 percent if he is dissatisfied with the award assigned.

Disability of the musculoskeletal system is primarily the inability, due to damage or infection in parts of the system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination and endurance. It is essential that the examination upon which ratings are based adequately portray the anatomical damage, and the functional loss, with respect to all these elements. The functional loss may be due to absence of part, or all, of the necessary bones, joints and muscles, or associated structures, or to deformity, adhesions, defective innervation, or other pathology, or it may be due to pain, supported by adequate pathology and evidenced by the visible behavior of the claimant undertaking the motion. Weakness is as important as limitation of motion, and a part that becomes painful on use must be regarded as seriously disabled. A little used part of the musculoskeletal system may be expected to show evidence of disuse, either through atrophy, the condition of the skin, absence of normal callosity or the like. 38 C.F.R. § 4.40 (2012).

Evidence of pain, weakened movement, excess fatigability, or incoordination must be considered in determining the level of associated functional loss, taking into account any part of the musculoskeletal system that becomes painful on use. 38 C.F.R. §§ 4.40, 4.45, 4.59 (2012); DeLuca v. Brown, 8 Vet. App. 202 (1995). The provisions regarding pyramiding do not forbid consideration of a higher rating based on greater limitation of motion due to pain on use, including flare ups. 38 C.F.R. § 4.14 (2012). However, pain itself does not constitute functional loss, and painful motion does not constitute limited motion for the purposes of rating under Diagnostic Codes pertaining to limitation of motion. Mitchell v. Shinseki, 25 Vet. App. 32 (2011). Pain indeed must affect the ability to perform normal working movements with normal excursion, strength, speed, coordination, or endurance in order to constitute functional loss. Id. 

The provisions 38 C.F.R. §§ 4.40, 4.45, 4.59 should only be considered in conjunction with the diagnostic codes predicated on limitation of motion. Johnson v. Brown, 9 Vet. App. 7 (1996).

The intent of the rating schedule is to recognize painful motion with joint or periarticular pathology as productive of disability. It is the intention to recognize actually painful, unstable, or malaligned joints, due to healed injury, as entitled to at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59 (2012).


With respect to the joints, the factors of disability reside in reductions of their normal excursion of movements in different planes. Inquiry will be directed to these considerations: (a) less movement than normal (due to ankylosis, limitation or blocking, adhesions, tendon-tie-up, contracted scars, etc.); (b) more movement than normal (from flail joint, resections, nonunion of fracture, relaxation of ligaments, etc.); (c) weakened movement (due to muscle injury, disease or injury of peripheral nerves, divided or lengthened tendons, etc.); (d) excess fatigability; (e) incoordination, impaired ability to execute skilled movements smoothly; and (f) pain on movement, swelling, deformity or atrophy of disuse. Instability of station, disturbance of locomotion, interference with sitting, standing and weight-bearing are related considerations. 38 C.F.R. § 4.45. For the purpose of rating disability from arthritis, the knee is considered a major joint. 38 C.F.R. § 4.45.

The applicable rating criteria for evaluating the Veteran's right knee disability, which is diagnostically rated prior to August 20, 2012, as chondromalacia patella of the right knee, status post arthroscopy with residual DJD, are contained in 38 C.F.R. § 4.71a, Diagnostic Codes 5003, 5010, 5256, 5257, 5258, 5259, 5260, 5261, and 5262. These provide the following:

5010
Arthritis, due to trauma, substantiated by X-ray findings:

Rate as arthritis, degenerative
38 C.F.R. § 4.71a, Diagnostic Code 5010 (2012).

5003
Arthritis, degenerative (hypertrophic or osteoarthritis):

Degenerative arthritis established by X-ray findings will be rated on the basis of limitation of motion under the appropriate diagnostic codes for the specific joint or joints involved (Diagnostic Code 5200 etc.). When however, the limitation of motion of the specific joint or joints involved is noncompensable under the appropriate Diagnostic Codes, a rating of 10 percent is for application for each such major joint or group of minor joints affected by limitation of motion, to be combined, not added under Diagnostic Code 5003. Limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm, or satisfactory evidence of painful motion. In the absence of limitation of motion, rate as below:

With X-ray evidence of involvement of 2 or more major joints or 2 or more minor joint groups, with occasional incapacitating exacerbations
20

With X-ray evidence of involvement of 2 or more major joints or 2 or more minor joint groups
10
Note (1): The 20 percent and 10 percent ratings based on X-ray findings, above, will not be combined with ratings based on limitation of motion.
Note (2): The 20 percent and 10 percent ratings based on X-ray findings, above, will not be utilized in rating conditions listed under diagnostic code 5013 to 5024, inclusive.
38 C.F.R. § 4.71a, Diagnostic Code 5003 (2012)

5256
Knee, ankylosis of:

Extremely unfavorable, in flexion at an angle of 45° or more
60

In flexion between 20° and 45°
50

In flexion between 10° and 20°
40

Favorable angle in full extension, or in slight flexion between 0° and 10° 
30
38 C.F.R. § 4.71a, Diagnostic Code 5256 (2012)

5257
Knee, other impairment of:

Recurrent subluxation or lateral instability: 


Severe
30

Moderate
20

Slight 
10
38 C.F.R. § 4.71a, Diagnostic Code 5257 (2012)

5258
Cartilage, semilunar, dislocated, with frequent episodes of "locking," pain, and effusion into the joint: 20

38 C.F.R. § 4.71a, Diagnostic Code 5258 (2012)



5259
Cartilage, semilunar, removal of, symptomatic: 10

38 C.F.R. § 4.71a, Diagnostic Code 5259 (2012)

5260
Leg, limitation of flexion of:

Flexion limited to 15°
30

Flexion limited to 30°
20

Flexion limited to 45°
10

Flexion limited to 60° 
0
38 C.F.R. § 4.71a, Diagnostic Code 5260 (2012)

5261
Leg, limitation of extension of:

Extension limited to 45° 
50

Extension limited to 30°
40

Extension limited to 20°
30

Extension limited to 15°
20

Extension limited to 10°
10

Extension limited to 5°
0
38 C.F.R. § 4.71a, Diagnostic Code 5261 (2012)

5262
Tibia and fibula, impairment of:

Nonunion of, with loose motion, requiring brace 
40

Malunion of:

With marked knee or ankle disability
30

With moderate knee or ankle disability
20

With slight knee or ankle disability
10
38 C.F.R. § 4.71a, Diagnostic Code 5262 (2012)

A knee disability may be rated under both the Diagnostic Code for arthritis and the Diagnostic Code for joint instability. The VA Office of the General Counsel held that a claimant who has arthritis and instability of the knee may be rated separately under Diagnostic Codes 5003 and 5257 of 38 C.F.R. § 4.71a. The Office of the General Counsel noted that Diagnostic Code 5257 specifically addressed only instability of the knee and Diagnostic Code 5003 specifically addressed only arthritis and disability from arthritis due to limitation of range of motion. The Office of the General Counsel determined that because these Diagnostic Codes applied either to different disabilities or to different manifestations of the same disability, the evaluation of knee dysfunction under both Codes would not amount to pyramiding (i.e., evaluating the same disability under various diagnoses) which was to be avoided under 38 C.F.R. § 4.14. See VAOPGCPREC 23-97 (July 1, 1997).

To give the Veteran every consideration in connection with the matter on appeal, the Board must consider all potentially applicable Diagnostic Codes under § 4.71a in rating the Veteran's disability. See, e.g., Butts v. Brown, 5 Vet. App. 532, 538 (1993) (the assignment of a particular Diagnostic Code is "completely dependent on the facts of a particular case"), and Pernorio v. Derwinski, 2 Vet. App. 625, 629 (1992) (one Diagnostic Code may be more appropriate than another based on such factors as the Veteran's relevant medical history, his current diagnosis, and demonstrated symptomatology).

By history, the Veteran's treatment medical records show that the Veteran was treated throughout his period of military service for recurrent complaints of bilateral knee pain when engaged in physical exercise. The Veteran was released from active duty in November 1991. Post-service medical records show continuity of painful bilateral knee symptoms persisting to the present day, which was ultimately diagnosed as chondromalacia patella. 

As relevant to the Veteran's right knee, private medical records show that in June 2004, meniscus tears of the right knee were revealed by medical imaging. The Veteran was underwent arthroscopic surgery of his right knee for a partial medial meniscectomy and lateral retinacula release for patellofemoral arthritis.

VA examination in July 2005 shows that the Veteran vocational background was as a cable television technician. He complained of daily right knee pain with subjective sensations of instability, like his right knee was about to give out under him. He wore a supportive brace on his right knee and was able to walk 100 yards comfortably, climb one flight of stairs, walk without a limp, and sit for up to 45 minutes. He was able to flex his knee to 140 degrees and extend it to zero degrees with no limitation due to pain, fatigue, weakness, or incoordination. No right knee joint locking, effusion, tenderness, crepitus, buckling, or instability of the medial and collateral ligaments was objectively demonstrated. 

In a written statement dated in February 2006, the Veteran's private treating physician opined that the Veteran was unable to effectively engage in his prior vocation because his bilateral knee disabilities reduced his lifting capacity and ability to perform physical actions that involved crouching and kneeling.

An October 2006 VA examination shows, in pertinent part, that the Veteran presented with subjective complaints of right knee pain with crepitus, which significantly reduced his capacity to engage in upright physical activities and the normal daily activities of living. The right knee displayed normal alignment. Mildly increased pain was reported with repetitive resisted extension of the right knee, but not with repetitive resisted flexion. Factoring additional functional loss due to repetitive motion pursuant to DeLuca v. Brown, 8 Vet. App. 202 (1995), the Veteran could extend his right knee to 5 degrees and flex it to 125 degrees. A small right knee effusion was observed. Tenderness of the right knee joint spaces was also observed. Crepitus was detected on range of motion testing. Notwithstanding subjective complaints of knee instability, his right knee ligaments objectively tested as stable. Mild incoordination of right knee motion and mild quadriceps atrophy were observed. The Veteran walked with a mild antalgic gait. The diagnosis was mild to moderate right knee arthritis.

The report of a September 2007 SSA medical examination shows that the Veteran had knee pain secondary to a meniscectomy and osteoarthritis. He used a cane and knee brace to support himself when ambulating, but that he was able to walk without it and displayed only a minimal limp. Range of motion testing shows extension of his right knee to zero degrees and flexion to 130 degrees, limited by onset of pain at the extremes of these ranges. No crepitus or effusion was detected. The SSA physician determined that the Veteran could function at his baseline level without his cane and that he displayed good strength despite his significant bilateral knee pain. No postural or manipulative limitations were detected. 

VA examination in April 2008 shows that the Veteran experienced significant knee pain that was only partially alleviated (but not eliminated) by prescribed narcotic medication. He needed assistance in bathing and dressing himself due to his knee pain and he avoided using stairs. He could not stand or remain seated for longer than 10 minutes without having to alternate standing or sitting to reduce his knee discomfort. Joint line tenderness, swelling, and patellofemoral grating and crepitus were detected. No effusion was observed. He could extend his right knee to zero degrees and flex it to 125 degrees, but these motions were accompanied with severe pain. Repetitive testing did not produce additional limitation of motion but produced increased subjective pain. However, an additional 10-degree loss of flexion was observed due to painful motion, thus translating to 115 degrees of flexion. No weakness, impaired endurance, incoordination, or actual right knee instability was objectively demonstrated. Also, no muscle atrophy or neurological deficits of the right knee and right lower extremity were detected. Recent MRI study revealed severe osteoarthritis of the right knee medial joint compartment and mild osteoarthritis of the patellofemoral joint, with soft tissue findings of a probable synovial cyst in the popliteal tendon and iliotibial band bursitis. X-rays revealed moderate to severe DJD with osteophyte formation. The examiner opined that although the Veteran did not have markedly diminished range of right knee motion, he had functional impairment of his ability to sit and stand for prolonged periods of more than 10 minutes at a time (with a similar limit of 10 minutes on how long he could operate an automobile without stopping while driving in a seated position), and to walk and lift because of knee pain. However, he was not precluded from sedentary employment so long as he could frequently change his positioning. 

VA examination in December 2009 shows no effusion of the Veteran's right knee. Slight patellofemoral crepitus was demonstrated on extension and flexion motions. His ligaments were intact and no swelling was observed. 

VA examination in September 2011 shows that the Veteran reported being able to sit or stand for no more than 30 minutes at a time before needing to change positioning secondary to onset of knee pain and stiffness. He was deemed capable of performing all activities of daily living, including dressing and bathing himself, driving, and tending to the needs of nature. He reported that he could not run but that he could walk a maximum distance of 200 feet, limited by knee pain. Climbing one flight stairs caused knee pain and going down a flight of stairs produced even greater knee pain. Objective examination of his right knee revealed no evidence of abnormal weight bearing, joint effusion, swelling, or laxity. He walked with a limp and used a cane. Pain on palpation of the medial aspect of the right knee and right knee joint line was elicited. The right knee could extend to zero degrees three times without pain, and could flex only to 90 degrees, limited by pain after repeated flexion. Moderate crepitus on range of motion was noted. Although the Veteran complained of experiencing recurring episodes of knee instability several times per week, objective examination did not demonstrate any laxity or instability of the ligaments of his right knee joint. VA authorized MRI on June 4, 2010, however, revealed a right posterior horn medial meniscal tear with displacement of the meniscal body and right chondromalacia patella.

Private and VA outpatient medical reports dated from 2004 - 2012 show that the Veteran was treated for ongoing chronic knee pain and was on prescribed opioid regimen to help manage his pain, although the records reflect that his caregivers were trying to wean him off these narcotic medications. Lay witness statements dated in 2008 from his immediate family members and neighbors reflect that he displayed outward signs of severe knee pain with associated limitation of his physical activities and need for assistance in engaging in the daily activities of living. Ultimately, his right knee was deemed to be so painful that a total knee arthroplasty was performed in August 2012. His hearing testimony of April 2013 indicated that, after having been unemployed since 2004 because his bilateral knee disabilities prevented him from working in his old vocation, he had recently obtained gainful employment with the federal government at a local SSA office, which accommodated his knee disabilities and allowed him to put to use a baccalaureate degree in paralegal science that he earned through VA vocational rehabilitation. 

The Board has considered the above evidence and finds that it does not support the assignment of an evaluation higher than 10 percent for chondromalacia patella of the right knee, status post arthroscopy with residual DJD for the period from November 17, 2004 to June 3, 2010. Although the Veteran presented subjective complaints of perceived right knee joint instability during this period, the clinical evidence does not objectively demonstrate the presence of any actual instability of the right knee joint during this period, such that the criteria of Diagnostic Code 5257 may be applied. On all examinations conducted from 2004 to 2011, the Veteran experienced pain on use and motion of his right knee, he nevertheless had extension that was not limited to more than 5 degrees and flexion that was not limited to less than 90 degrees during this period, even factoring in additional limitation of extension and flexion due to functional loss and pain after repetitive motion testing. Limitation of extension to 5 degrees and limitation of flexion to 90 degrees still does not produce a compensable limitation of motion under Diagnostic Codes 5260 and 5261. The limitation of prolonged use of the right knee on walking, sitting, and standing is deemed by the Board to be adequately compensated by the 10 percent evaluation assigned for this period. Similarly, although a single episode of a small right knee effusion was noted on examination in October 2006, there was no actual right knee joint locking or frequent effusion demonstrated, such that the Board does not find it to more closely approximate the criteria for a 20 percent evaluation under Diagnostic Code 5258. Diagnostic Code 5259 contemplates a 10 percent rating due to symptomatic removal of the semilunar cartilage (meniscectomy). However, the medical evidence establishes that the Veteran only had a partial meniscectomy performed by way of repair of the damaged cartilaginous pad on his right knee and not complete removal of the semilunar cartilage, as contemplated by Diagnostic Code 5259. Thusly, a 10 percent evaluation assigned under Diagnostic Code 5003-5014 on the basis of DJD with characteristic pain on motion of the right knee for the period from November 17, 2004 to June 3, 2010 is appropriate. 

The Board finds that a VA-authorized MRI of the Veteran's right knee conducted on June 4, 2010, objectively demonstrates that there displacement of the meniscal body. This clinical finding, confirmed on medical imaging study, more closely approximates the criteria contained in Diagnostic Code 5258, which contemplates a 20 percent evaluation for dislocated semilunar cartilage with frequent episodes of pain, notwithstanding the absence of locking and effusion. 38 C.F.R. § 4.7 (2012). Therefore, resolving all doubt in the Veteran's favor, the Board will allow a staged rating increase to 20 percent under this Code, effective June 4, 2010, for chondromalacia patella of the right knee, status post arthroscopy and residual DJD. 38 U.S.C.A. § 5107(b) (West 2002); 38 C.F.R. § 4.3 (2012); Gilbert v. Derwinski, 1 Vet. App. 49 (1990). The objective evidence does not demonstrate, however, that the Veteran's right knee disability is manifested by limitation of motion, ankylosis, or severe instability that would warrant the assignment of an evaluation greater than 20 percent under any of the applicable Diagnostic Codes. 

The Board notes that the increase in severity of the Veteran's right knee, primarily due to the semilunar cartilage dislocation discussed above, is not objectively demonstrated any earlier than the VA MRI study of June 4, 2010. As the constellation of symptomatology presented by the evidence does not portray a disability picture that more closely approximates the criteria for an evaluation above 10 percent for chondromalacia patella of the right knee, status post arthroscopy and residual DJD for the period from November 17, 2004 to June 3, 2010, the Veteran's claim for a higher initial rating in this regard must be denied.

A rating in excess of the assigned schedular evaluations for the Veteran's service-connected disabilities addressed herein on the merits may be granted when it is demonstrated that the particular disability presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization as to render impractical the application of the regular schedular standards. See 38 C.F.R. § 3.321(b)(1) (2012). To accord justice in an exceptional case where the schedular standards are found to be inadequate, the field station is authorized to refer the case to the Under Secretary for Benefits or the Director, Compensation and Pension Service, for assignment of an extraschedular evaluation commensurate with the average earning capacity impairment. 38 C.F.R. § 3.321(b)(1) (2012). The Court has held that the Board is precluded by regulation from assigning an extraschedular rating under 38 C.F.R. § 3.321(b)(1) (2012) in the first instance; however, the Board is not precluded from raising this question, and in fact is obligated to liberally read all documents and oral testimony of record and identify all potential theories of entitlement to a benefit under the law and regulations. See Floyd v. Brown, 9 Vet. App. 88 (1996). The Court further held that the Board must address referral under 38 C.F.R. § 3.321(b)(1) only where circumstances are presented which the Director of VA's Compensation and Pension Service might consider exceptional or unusual. See Shipwash v. Brown, 8 Vet. App. 218, 277 (1995).

Extraschedular consideration involves a three step analysis. Thun v. Peake, 22 Vet. App. 111 (2008). First, the Board or the RO must determine whether the schedular rating criteria reasonably describe the Veteran's disability level and symptomatology. Id. at 115. If the schedular rating criteria do reasonably describe the Veteran's disability level and symptomatology, the assigned schedular evaluation is adequate, referral for extraschedular consideration is not required, and the analysis stops. Id. If the RO or the Board finds that the schedular evaluation does not contemplate the Veteran's level of disability and symptomatology, then either the RO or the Board must determine whether the Veteran's exceptional disability picture includes other related factors such as marked interference with employment and frequent periods of hospitalization. Id. at 116. If this is the case, then the RO or the Board must refer the matter to the Under Secretary for Benefits or the Director of the Compensation and Pension Service for the third step of the analysis, determining whether justice requires assignment of an extraschedular rating. Id.

The Board finds that there is no evidence that the Veteran's service-connected right knee disability has presented such an unusual or exceptional disability picture at any time from November 17, 2004 to August 19, 2012, so as to require consideration of an extraschedular evaluation pursuant to the provisions of 38 C.F.R. § 3.321(b) (2012). In this case, the evidence of record does not indicate the Veteran is frequently hospitalized for his service-connected right knee disability. Although the clinical evidence indicates that the Veteran is limited in his capacity to engage in any occupation that requires him to perform physical activities that involve prolonged standing, sitting, or walking, there is no clinical evidence that deems him to be precluded from performing sedentary work, notwithstanding his period of unemployment from 2004, when he was no longer able to pursue his old vocation as a cable television technician, until recently, when he was able to successfully obtain gainful employment in the federal government in a sedentary position that utilized his new skills as a paralegal following VA vocational rehabilitation. The criteria of the applicable rating schedule as contained in 38 C.F.R. § 4.71a, Diagnostic Codes 5003-5010, 5257, 5258, 5259, 5260, and 5261 adequately contemplate his present level of impairment. 

The Board cannot concede that the Veteran's right knee disability, standing by itself, causes marked interference with his employment. Furthermore, the clinical evidence fails to show that the disability picture created by the right knee disability is exceptional or unusual. In this regard, notwithstanding his right knee joint pain and his need for a period of pain management through prescription narcotics, this knee joint is stable on stress testing. Having reviewed the record with these mandates in mind, the Board finds that the staged schedular ratings presently assigned adequately reflect the state of the Veteran's right knee disability for the periods to which they are applied, and that there is no evidentiary basis for referral of the case for extraschedular consideration.

The Board that VA must also consider entitlement to total disability evaluation based on individual unemployability (TDIU)when a Veteran seeks an increased rating for a service-connected disability, if it is raised by the evidence of record. See Rice v. Shinseki, 22 Vet. App. 447 (2009). Here, the Veteran has claimed to be unemployable due to his service connected disabilities; and, the RO has rendered adverse decisions on the TDIU issue in July 2008 and January 2012, which would cover the applicable periods when the Veteran was not receiving a 100 percent schedular rating. The Veteran has not appealed those decisions.




ORDER

The appeal of the January 2007 rating decision, with respect only to the issue of entitlement to an effective date prior to November 17, 2004, for an original award of service connection for a chronic orthopedic disability of the right and left knee, is dismissed.

An initial evaluation greater than 10 percent for chondromalacia patella of the right knee, status post arthroscopy with residual DJD, prior to June 3, 2010 is denied.

A 20 percent evaluation for chondromalacia patella of the right knee, status post arthroscopy with residual DJD, for the period from June 4, 2010 to August 19, 2012 is granted.


REMAND

Upon review and consideration of the evidence contained in the Veteran's claims file and the transcript of his oral testimony before the Board in April 2013, the Board finds that additional evidentiary development is warranted before it can properly adjudicate the issues of entitlement to an initial evaluation greater than 10 percent from November 17, 2004 to July 4, 2010 for chondromalacia patella of the left knee, status post arthroscopy with residual DJD; an initial evaluation greater than 10 percent for left knee laxity from April 24, 2008 to July 4, 2010; and an evaluation greater than 30 percent for status post total knee arthroplasty, left knee, from September 1, 2011.

The Board notes that the most recent VA examination of record that addresses the severity of the Veteran's left knee disability is dated in September 2011. At his April 2013 hearing, the Veteran presented oral testimony indicating that his left knee disability has worsened since the time of the latest VA examination, stating that he did not feel he obtained any greater benefit from his total left knee arthroplasty and reporting that he experienced more limitation of motion than before, with continued left knee joint pain and loss of function. The Veteran is competent to describe his perceived orthopedic symptomatology with regard to his left knee, and therefore it is entirely possible that his left knee has worsened and that objective findings would be obtained on current examination demonstrating that the severity of his left knee disability has increased. See Vazquez-Flores v. Shinseki, 24 Vet. App. 94, 102 (2010). A remand is therefore warranted so that the Veteran can be scheduled for a contemporaneous medical examination to determine the current level of impairment associated with his left knee disability, status post total knee arthroplasty. Weggenmann v. Brown, 5 Vet. App. 281 (1993) (The Veteran claims that his service-connected left knee disability is worse than when previously rated, and the available evidence is insufficiently current for an adequate evaluation of his current condition given the fluctuating fluidity of his impairment. VA's duty to assist therefore includes providing him with a new medical examination).

Moreover, as additional medical records may be obtained in the course of this remand that provide a clearer picture as to the severity of the Veteran's left knee disability during the pendency of the claim, the Board will hold in abeyance further adjudication of the staged rating periods pertinent to the above claim, pending this evidentiary development. 

Accordingly, in view of the foregoing discussion, the case is REMANDED to the RO/AMC for the following action:

1. Obtain the names and addresses of all medical care providers, both VA and non-VA, who treated the Veteran's left knee, since November 17, 2004 (the effective date of the award of service connection assigned to the initial overarching left knee disability). After obtaining the appropriate releases, those records not already associated with the evidence should be obtained for inclusion in the evidence. All attempts to procure records should be documented in the file. If records identified as relevant by the Veteran cannot be obtained, a notation to that effect should be made in the file. The Veteran is to be notified of unsuccessful efforts in this regard, to include providing him with the opportunity to obtain and submit those records for VA review. 

2. Then, arrange for the Veteran to undergo an appropriate VA examination to ascertain the current nature and extent of his service-connected residuals of status-post total left knee arthroplasty. Any indicated diagnostic tests and studies must be accomplished. The examiner must review the Veteran's claims folder in conjunction with the examination. A notation to the effect that this review has taken place should be made in the evaluation report.

Any indicated diagnostic tests and studies must be accomplished. In addition, 

(a) All pertinent symptomatology and findings must be reported in detail, to include, in degrees, the range of motion of the Veteran's left knee (to include flexion and extension). 

The examiner should note the point at which motion becomes painful, if any, on flexion and extension. Also, the extent of any incoordination, weakened movement and excess fatigability on use should be described, as well as flare-ups or when the left knee is used repeatedly. To the extent possible, functional impairment due to incoordination, weakened movement and excess fatigability, as well as due to flare-ups or when the left knee is used repeatedly, should be assessed in terms of additional degrees of limitation of motion.

(b) The examiner must also objectively characterize any painful motion or weakness associated with chronic residuals of status-post total left knee arthroplasty as being productive of slight, moderate, or severe.

(c) The examiner must also comment upon whether the service-connected residuals of status-post total left knee arthroplasty are manifested by recurrent subluxation or lateral instability and, if so, the examiner should objectively characterize it as being productive of slight, moderate, or severe impairment.

(d) The examiner should make an objective determination as to whether the residuals of status-post total left knee arthroplasty are manifested by frequent episodes of joint "locking," pain, and effusion into the left knee joint. 

The examiner should provide a complete rationale for any opinion provided. If he/she is unable to provide an opinion without resorting to speculation or conjecture, he/she should so state in his/her discussion and explain why. The report prepared must be typed.

3. Notify the Veteran that it is his responsibility to report for the above examination and to cooperate in the development of the claims being remanded. The consequences for failure to report for a VA examination without good cause may include denial of the claims. 38 C.F.R. §§ 3.158, 3.655 (2012). In the event that the Veteran does not report for the aforementioned examination, documentation must be obtained which shows that notice scheduling the examination was sent to the last known address. It must also be indicated whether any notice that was sent was returned as undeliverable.

4. Thereafter, the claims file must be reviewed to ensure that all of the foregoing requested development has been completed. After all appropriate evidentiary development has been completed, readjudicate the Veteran's claims of entitlement to an initial evaluation greater than 10 percent from November 17, 2004 to July 4, 2010 for chondromalacia patella of the left knee, status post arthroscopy with residual DJD; an initial evaluation greater than 10 percent for left knee laxity from April 24, 2008 to July 4, 2010; and an evaluation greater than 30 percent for status post total knee arthroplasty, left knee, from September 1, 2011.

If the maximum benefit sought on appeal remains denied with regard to any of the above claims, a supplemental statement of the case must be provided to the Veteran and his representative. After they have had an adequate opportunity to respond, the appeal must be returned to the Board for appellate review, if appropriate. The Board intimates no opinion as to the outcome in this case by the action taken herein.

The appellant has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2012).



______________________________________________
MICHAEL A. HERMAN
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs